UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

LACY PATTON,

                    Plaintiff,

          v.                                    CAUSE NO. 3:18-CV-419 DRL-MGG

FOREST RIVER, INC.,

                    Defendant.

OPINION AND ORDER

Lacy Patton sued his former employer, Forest River, Inc., alleging that the company unlawfully retaliated against him for making claims about sexual harassment in violation of Title VII of the Civil Rights Act of 1964 and taking leave under the Family and Medical Leave Act. After comments from coworkers became unbearable, Forest River offered Mr. Patton a transfer to another plant, which he accepted based on certain understandings. His work duties, pay, and conditions there proved less than commensurate to him; and, on the eve of his decision to move to another company, Forest River terminated his employment for poor attendance. Forest River has now moved for summary judgment against Mr. Patton. Mr. Patton has moved to strike certain portions of his testimony that the company cites to support its motion. For the following reasons, the court denies Mr. Patton's motion to strike and denies Forest River's summary judgment motion.

BACKGROUND

Forest River operates multiple manufacturing facilities throughout the Midwest and West Coast that build motorized recreational vehicles, trailers, buses, and mobile offices. ECF 30-1 ¶ 3. Mr. Patton joined Forest River as an employee at its Dynamax Plant in February 2012, *see* ECF 30-2 at 65

and 76, at which time he received a copy of Forest River's anti-discrimination policy and handbook, *see* ECF 30-3. He began working at Forest River's Sunseeker Plant in January 2013. ECF 30-2 at 79.

At the Sunseeker Plant, Mr. Patton worked on the production line in the electrical department where he installed rough wiring. ECF 41-1 ¶ 3. Rough wiring a motor home is a challenging task, both mentally and physically, and it requires special knowledge and skill. *Id.* To perform his job adequately, Mr. Patton had to read prints and schematics and comply with applicable Recreational Vehicle Industry Association (RVIA) safety codes. *Id.* Moreover, rough wiring involved work at the front of the production line, and a mistake on his part could require that the unit be undone if it were discovered at the end of the production line. *Id.*

While working at the Sunseeker Plant, Mr. Patton apparently became comfortable enough with his coworkers to text message them about personal matters. *See* ECF 30-4 at 285-87. In his texts, he also discussed his ongoing litigation involving an automobile accident against Tim Parchman, a coworker whom Mr. Patton alleges was harassing him. *Id.* at 290-92.

Beginning August 2017, Mr. Patton began to perceive that his coworkers were harassing him. ECF 30-2 at 98-99. While his job performance never suffered, he claimed that their comments made him feel like "lesser of a man, like [he] wasn't qualified." *Id.* at 61. Mr. Patton thought that one coworker was "harassing [him] in, like, a sweet way," when he told Mr. Patton that he "hope[d] your kids aren't in baseball this year, because we're going to be here all day, and you're not going to be able to spend time with your kids." *Id.* at 103. Other coworkers made fun of his braces, hygiene, and combed hair. *Id.* at 61. Mr. Patton was also called "gay," "faggot," and "pretty boy" and referred to as "one of the 'Backstreet Boys.'" *Id.* at 61, 107. His coworkers called him "lacy panties," referred to him as an effeminate "sissy," and other inappropriate comments. ECF 41-1 ¶ 6. Mr. Patton initially tolerated the comments, hoping that they would abate in frequency and intensity over time, but they

did not. ECF 41-1 ¶ 7. Mr. Patton alleges that there was a meanness to the comments that went beyond ordinary teasing and made him feel anxious and depressed.[1] *Id.*

In August 2017, a few weeks after the teasing began, Mr. Patton complained to Tim Buell, Mr. Patton's work group leader. ECF 41-1 ¶ 8. In early September 2017, he complained to the Sunseeker plant manager, Mike Williams, about the perceived harassment. *Id.* After his conversation with Mike Williams, Mr. Patton alleges that two people retaliated against him. ECF 30-2 at 93-94. First, his supervisor, Ron Daley, asked Mr. Patton if he had "lost his kitty." *Id.* at 93-94. Second, his work group leader, Tim Buell, allegedly said, "there's not a hair on [Mr. Patton's] ass" and "Backstreet's back" (referring to Mr. Patton); and thereupon assigned Mr. Patton to repair electrical mistakes, which Mr. Patton believed was a retaliatory act. *Id.* at 62-63, 93-94, 124-26.

Mr. Patton called Forest River's Chief Ethics and Compliance Officer, John David Youmans, Jr. to complain. ECF 41-1 ¶ 8. Mr. Youmans listened to Mr. Patton's complaints about the comments from Mr. Daley and Mr. Buell, and he reviewed a recording Mr. Patton had made of his conversation with Mr. Williams. ECF 30-2 at 25-26. Mr. Patton then complained to Wendy Tubicsak, Forest River's human resource manager. ECF 41-1 ¶ 8. She likewise listened to Mr. Patton's recording of his conversation with the plant manager, and she then interviewed Plant Manager Williams and Group Leader Buell. ECF 30-5 at 47-48. Together, Ms. Tubicsak and Mr. Patton decided that transferring him out of the Sunseeker Plant would be best, although it appears that Ms. Tubicsak suggested the idea to Mr. Patton. ECF 30-2 at 63. Mr. Patton took leave under the Family and Medical Leave Act (FMLA) while he decided which plant he wanted to work at next. *Id.* at 179-80.

---

[1] Mr. Patton also believed that he was being paid less than his coworkers, which made him feel less than competent at his job, though he admitted he did not know who decided how much he would get paid or how the pay system at Forest River worked. ECF 30-2 at 83-87, 89, 99, 135-37. Mr. Patton says he was paid less than others, not because of sex, but because the person he suspects was giving out pay decided to pad the checks of his son and close buddies who worked in the department. *Id.* at 84-85; *see also* ECF 30-1 ¶¶ 4-5. That claim has been abandoned at this point.

Ms. Tubicsak then called Scott Chambers, the Plant Manager at the Berkshire Plant, asking him if he had an opening for a transfer employee. ECF 30-6 at 4-5. Ms. Tubicsak expected that Mr. Patton would be transferred into the electrical department at Berkshire Plant because that was "protocol" and "standard operating procedure" whenever a lateral transfer occurred. ECF 41-15 at 33-35. Ms. Tubicsak also told Mr. Patton that he would be placed in the electrical department at Berkshire Plant. *Id.* at 40. Mr. Chambers, not knowing that Mr. Patton had prior electrical experience, replied to Ms. Tubicsak that there was an opening in the final finish department. ECF 30-6 at 5-6. Subsequently, Mr. Patton interviewed with Mr. Chambers and Cory Hundt, the Assistant Plant Manager of the Berkshire Plant, and Mr. Chambers told Mr. Patton that he would be doing work on the units at the end of the line and would need to jump in and fix units to get them ready to ship. ECF 30-1 ¶ 11. When Mr. Chambers asked Mr. Patton if that was something he would be interested in, Mr. Patton replied, "Yeah, for sure." *Id.* ¶¶ 11-12.

Mr. Patton began working at the Berkshire Plant on September 22, 2017. ECF 30-2 at 70. While there, he appears to concede that he never suffered any discriminatory harassment, though he says his supervisors did make some off-handed jokes. *Id.* at 201-02. He also says his work performance never suffered. *Id.* at 144. Nevertheless, he was upset about his time at the Berkshire Plant for three reasons. First, Mr. Patton did not like that he did not get a working timecard when he first got there and had to record his work hours on a piece of a paper. ECF 30-4 at 282. Second, he believes that he was paid less at the Berkshire Plant than he would have been at the Sunseeker Plant. ECF 30-2 at 174.

Third, Mr. Patton did not enjoy his new job duties and described them as "very hard work." *Id.* at 194-96. He says he wanted to do more electrical work, ECF 41-1 ¶ 13, but he never requested to be transferred into the electrical group at the Berkshire Plant, ECF 30-2 at 222.

Mr. Patton reported to Mr. Hundt, who immediately assigned him the task of cleaning tile and grout inside motor homes that had been parked outside in the sun for months. ECF 41-1 ¶ 11. Mr.

Patton estimates that the insides of the units were probably over 100 degrees. *Id.* When Mr. Patton asked Mr. Hundt if he could run the air conditioning or at least open some windows or the door, Mr. Hundt said no because he did not want dust to get into the units. *Id.* Mr. Patton was required to clean the tiles using a solvent-like liquid and a rag that emitted an acrid vapor that irritated his eyes and throat. *Id.* On top of that work, Mr. Hundt ordered him to swap out the captain's seats in four units that weighed 150 pounds, which required him to carry them over his shoulder for several hundred feet. *Id.* When Mr. Patton asked Mr. Hundt if he could use a tow motor or a hand truck to transport the seats, Mr. Hundt told Mr. Patton that he could not do so. *Id.* Mr. Patton states it took him eight days to complete this project, after which he was moved to final finish, which consists of physically light, low-skilled work. *Id.* ¶¶ 11, 13. When he arrived, his group leader said to Mr. Patton, "I've been told not to get too used to you being here!" *Id.* ¶ 12. He worked in final finish for about two weeks until he was fired on October 20, 2017. *Id.*

While at Berkshire, Mr. Patton called in sick or left early on five days. *See* ECF 30-7. On October 20, 2017, Mr. Chambers signed a personnel action notice terminating Mr. Patton, which mentioned the five days he missed work or left early. ECF 30-7. Upon hearing the news, Mr. Patton reached out to Ms. Tubicsak, but she never responded. ECF 41-1 ¶ 14. The day before, the Berkshire Plant Manager sent Ms. Tubicsak an email saying he intended to "wash [his] hands" of Mr. Patton. ECF 41-23. In Forest River's letter to the Equal Employment Opportunity Commission (EEOC), the company maintained that Mr. Patton quit his job, ECF 41-18 at 3, though that reason changed in this case. On October 23, 2017, Mr. Patton began working for Grand Design RV where he had applied while still working at Forest River. ECF 30-4 at 259-60.

In March 2018, Mr. Patton filed charges of discrimination and retaliation with the EEOC, which dismissed his charges and issued him a right-to-sue notice that same month. ECF 30-9. Mr. Patton then filed a state court complaint in May 2018, alleging sex discrimination and retaliation under

Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-3, 2000e-5. Forest River removed this action to federal court. This court has jurisdiction pursuant to 28 U.S.C. § 1331.

During the court's status conference on September 19, 2019, and again at oral argument on this motion held February 14, 2020, Mr. Patton acknowledged that he was proceeding in this case solely on the retaliation claim. Additionally, Mr. Patton abandoned any sex discrimination claim in his response to Forest River's summary judgment motion. *See generally* ECF 41. Thus, the court addresses only the retaliation claim here.

## STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must present the court with evidence on which a reasonable jury could rely to find in his favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). The court must construe all facts in the light most favorable to the non-moving party, view all reasonable inferences in that party's favor, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491-92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

In performing its review, the court "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Nor is the court "obliged to research and construct legal arguments for parties." *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011). Instead, the "court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Id.* The court must grant a summary judgment motion when no such genuine factual issue—a triable issue—exists under the law. *Luster v. Ill. Dept. of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011).

DISCUSSION

A.     *The Court Denies the Motion to Strike Because Mr. Patton's Statements of Concern Are Not Unhelpful Legal Conclusions.*

As an initial matter, Mr. Patton has moved to strike portions of his deposition testimony, as used in Forest River's summary judgment motion, regarding whether he believed his discharge by Forest River was illegal or who may have retaliated against him, doing so on two grounds: (1) Forest River misrepresents Mr. Patton's answers and (2) the questions as framed invited Mr. Patton to offer legal conclusions. ECF 33 at 1.

Under Rule 56(c)(2), a party may object to—as opposed to move to strike—summary judgment evidence that cannot be presented in a form that would be admissible at trial. While the advisory committee notes to this rule state that "[t]here is no need to make a separate motion to strike" when objecting to evidence under Rule 56, *see* Fed. R. Civ. P. 56 advis. comm. n. 2010, the local rule of this jurisdiction requires such a motion. N.D. Ind. L.R. 56-1(e). Motions to strike are generally disfavored but may be used to expedite a case by "remov[ing] unnecessary clutter," *Heller Fin., Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d 1286, 1294 (7th Cir. 1989), or otherwise disposing of inadmissible material from summary judgment analysis.[2] *See* Fed. R. Civ. P. 56(c)(2). Mr. Patton has focused his motion to strike on the argument that certain evidence is inadmissible.

Generally, "lay testimony offering a legal conclusion is inadmissible because it is not helpful to the jury, as required by [Federal Rule of Evidence] 701(b)." *United States v. Noel*, 581 F.3d 490, 496 (7th Cir. 2009). In contravention of the rules, a "witness's opinion that the facts in a case meet the elements of the [law] will likely constitute unhelpful testimony because it merely tells the jury what

---

[2] Forest River relies in part on Fed. R. Civ. P. 12(f), ECF 37 at 3, 5, but the materials submitted in support of a summary judgment motion are not "pleadings" to which that rule plainly applies. *See, e.g.,* Fed. R. Civ. P. 7(a) (defining pleadings); Fed. R. Civ. P. 12(f) (authorizing court to strike materials from a pleading). Instead, the court has the authority to strike material under Rule 56 given its command that evidence be admissible. Fed. R. Civ. P. 56(c)(2).

results to reach." *United States v. Locke*, 643 F.3d 235, 240-41 (7th Cir. 2011). That said, this circuit has held lay witness testimony admissible that contained potential legal terms when the legal terms were used in a "colloquial sense" and did not require the witness to opine about the statutory language or comment on the defendant's specific intent. *Id.* at 241-42.

The court is persuaded that Mr. Patton's statements whether his discharge by Forest River was believed for certain reasons to be "illegal," or who may have retaliated against him, are admissible in this summary judgment proceeding, much like the statements in *Locke*. First, while questioning counsel might consider choosing the words of these questions more carefully, and while opposing counsel would be advised to object if he believed the questions presented improper form questions so as not to waive this position, the reality is that these questions (at least those raised in the motion) merely asked Mr. Patton about who retaliated against him in the idiomatic sense of normal conversation and *what he believed was illegal*—not a legal conclusion, but what he as a layperson believed improper, inappropriate, wrong, or any other colloquial substitute that could have been used in lieu of "illegal." The question never asked Mr. Patton whether the conduct was as a matter of law illegal; it invited him to articulate what he believed was wrongful. *See, e.g.,* ECF 33-3 at 6 ("why do *you think* that was illegal?").

Second, Mr. Patton's testimony would assist the trier of fact in assessing his retaliation claim because it would highlight his understanding of why he was transferred or terminated—key issues in this case. *See, e.g., Gossett v. Okla. ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1178-80 (10th Cir. 2001) (admitting testimony of lay witness who claimed that plaintiff's withdrawal was the result of gender discrimination when her "opinion was a means of conveying her impression based on what she had herself perceived, and it was predicated upon concrete facts within her own observation and recollection"); *Bailey v. Canan*, 82 F. Supp. 2d 966, 976 n.12 (S.D. Ind. 2000) ("that [Plaintiff] felt he was harassed is not a legal conclusion and can be found in the evidence [he] cites to for the statement

he gave"); *cf. Carter v. DecisionOne Corp.*, 122 F.3d 997, 1005 (11th Cir. 1997) (admitting lay witness testimony of an "ultimate issue" when it was based on personal observations).

To be sure, the court does not treat these deposition statements as dispositive of the validity of a legal position, just important to how Mr. Patton believed his rights had been violated, appreciating that all testimony and other facts must be construed in the most favorable light to him. *See Bellaver*, 200 F.3d at 491-92. In short, the statements are considered for their facts, not their opinion on any aspect of the law. Accordingly, the court denies the motion to strike.

B.    *Mr. Patton Has Established Triable Issues on His Retaliation Claim.*

Title VII "prohibits various 'unlawful employment practices' involving discrimination on the basis of 'race, color, religion, sex or national origin.'" *E.E.O.C. v. CVS Pharm., Inc.*, 809 F.3d 335, 339 (7th Cir. 2015) (quoting 42 U.S.C. §§ 2000e-2, 2000e-3). The statute also prohibits retaliation against an employee "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). The purpose of this anti-retaliation provision is to "prevent employer interference with 'unfettered access' to Title VII's remedial mechanisms . . . by prohibiting employer actions that are likely 'to deter victims of discrimination from complaining to the EEOC,' the courts, and their employers." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997)). This prohibition "must be construed to cover a broad range of employer conduct." *Thompson v. N. Am. Stainless, L.P.*, 562 U.S. 170, 173 (2011). The pertinent inquiry is whether an employer has acted in a way that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 174 (citation omitted).

Mr. Patton proceeds on the argument that Forest River retaliated against him because he took FMLA leave and made a claim of sexual harassment. In a retaliation claim, a plaintiff may proceed under either the direct or indirect methods of proof (not to be confused with any prior distinction

between direct and indirect evidence). *See Swyear v. Fare Foods Corp.*, 911 F.3d 874, 885 (7th Cir. 2018); *Poullard v. McDonald*, 829 F.3d 844, 856 (7th Cir. 2016). Although this circuit has abandoned the distinction between "direct" and "indirect" evidence in discrimination claims, *see Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 763-64 (7th Cir. 2016), the separate methods have continued to apply in the retaliation context, *see Swyear*, 911 F.3d at 885. Still, the court avoids sorting evidence mechanically into two different piles—one "direct" and one "indirect"—and instead focuses on the overriding central inquiry: "could a reasonable trier of fact infer retaliation[?]" *See Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 564 (7th Cir. 2015); *accord Ortiz*, 834 F.3d at 765-66 (rejecting "convincing mosaic" as a legal test and rejecting "direct" and "indirect" distinction between evidence).

The indirect method is of no aid to Mr. Patton. The indirect method requires a plaintiff to show (1) he engaged in a protected activity; (2) he performed his job duties according to his employer's legitimate expectations; (3) he suffered an adverse action; and (4) he was treated less favorably than similarly situated employees who did not engage in the protected activity. *See Swyear*, 911 F.3d at 885. Whether he might meet certain of these requirements, he has not shown how he was treated less favorably than similarly situated employees. For his retaliation claim, Mr. Patton offers no comparator on this record that would permit a reasonable jury's finding of retaliation.[3] *See Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012) ("[T]he similarly-situated inquiry is flexible, common-sense, and factual. It asks essentially, are there enough common features between the individuals to allow a meaningful comparison?").

His retaliation claim thus must rely on the direct method. Mr. Patton must show that (1) he engaged in a protected activity; (2) he suffered a material adverse employment action; and (3) there was a causal connection between the protected activity and adverse employment action. *Swyear*, 911

---

[3] In his brief, Mr. Patton refers to Tim Parchman as a comparator—but based solely on how they were compensated at the Sunseeker Plant. Regardless of any difference in pay between Mr. Patton and Mr. Parchman, the alleged disparity was in place *before* his claim of harassment, so cannot be a basis for retaliation.

F.3d at 885; *see also Burlington*, 548 U.S. at 57. On this record, he has established a triable retaliation claim. *See* Fed. R. Civ. P. 56.

1. *Mr. Patton Engaged in Two Protected Activities: Taking FMLA Leave and Making a Good Faith Complaint to Management about Sexual Harassment.*

Mr. Patton says he engaged in statutorily protected activities in two distinct ways: by taking FMLA leave and by complaining to management about the alleged sexual harassment occurring at the Sunseeker Plant. Forest River has not contested this prong, so the court will not tarry on it. "Taking FMLA leave is indisputably a statutorily protected activity." *Nigh v. School Dist. of Mellen*, 50 F. Supp. 3d 1034, 1053 (W.D. Wis. 2014). A good faith claim of sexual harassment likewise is a statutorily protected activity. *See, e.g., Jackson v. Birmingham Bd. Of Educ.*, 544 U.S. 167, 187-88 (2005) (good faith complaints); *Hively v. Ivy Tech Cmty. Coll. of Ind.*, 853 F.3d 339, 351-52 (7th Cir. 2017) (harassment based on sexual orientation covered under the word "sex" in Title VII); *Bernier v. Morningstar, Inc.*, 495 F.3d 369, 376 (7th Cir. 2007) (good faith complaint); *see also Altitude Exp., Inc. v. Zarda*, 139 S. Ct. 155 (2019) (granting *writ of certiorari* on circuit split over sexual orientation under Title VII). Mr. Patton thus has established this first prong of his retaliation claim.

2. *A Reasonable Jury Could Find that Forest River Took Two Materially Adverse Actions Against Mr. Patton: Demotion and Involuntary Termination.*

A materially adverse action is one that might dissuade a reasonable worker from engaging in protected activity, such as making a charge of discrimination. *Burlington*, 548 U.S. at 57. To be materially adverse, the action must be more than a mere inconvenience or trivial alteration of job responsibilities. *Porter v. City of Chi.*, 700 F.3d 944, 954 (7th Cir. 2012). Sporadic inappropriate or even rude comments are not materially adverse, *see id.*, appreciating that occasional vulgar banter generally will not alone establish an intolerable work environment, *Swyear*, 911 F.3d at 881. In contrast, diminished compensation or termination often will constitute a materially adverse action. *O'Neal v. City of Chi.*, 392 F.3d 909, 911 (7th Cir. 2004). A lateral transfer that prevents an individual from utilizing his skills

and experience or subjects him to a humiliating, degrading, unsafe, or otherwise significantly negative alteration in the workplace environment may also constitute an adverse action. *Id.*

On this record, a jury could reasonably conclude that Forest River took two materially adverse actions against Mr. Patton: involuntarily terminating him and demoting him in his transfer from the Sunseeker Plant to the Berkshire Plant. By contrast, the various comments Mr. Patton endured at the Sunseeker Plant following his claim of harassment, while not condoned in any way by this court, were not materially adverse actions for purposes of a retaliation claim. The comments include those made by Ron Daley asking Mr. Patton if he had "lost his kitty" and those by Tim Buell stating that "there's not a hair on [Mr. Patton's] ass" and that "Backstreet's back," ECF 30-2 at 63, 94. However inappropriate these comments may be, and they are, they do not rise to the level of actionable adverse actions for a Title VII retaliation claim. *See Burlington*, 548 U.S. at 68; *Porter*, 700 F.3d at 956; *Stephens v. Erickson*, 569 F.3d 779, 790 (7th Cir. 2009); *see also Aryain v. Wal-Mart Stores Tex. L.P.*, 534 F.3d 473, 484-85 (5th Cir. 2008) (poor treatment of employee by supervisors did not rise to level of material adversity, but instead fell into category of petty slights, minor annoyances, and simple lack of good manners in the workplace).

Forest River's explanation for what happened with Mr. Patton's job has shifted over time, but on this record and taking all inferences in Mr. Patton's favor, he was involuntarily terminated. That involuntary termination was a material adverse action. Mr. Patton may well have been planning his departure for a new job at Grand Design, *see* ECF 30-4 at 260 ("I was going to give my two-week notice that morning, and Grand Design knew this."), but other evidence establishes that his termination was nonetheless involuntary, *see* ECF 41-4. Forest River relies on the so-called admission from Mr. Patton in his deposition that his retaliation claim is not based on his termination. The questioning and his testimony in total are not as clear on that point as Forest River suggests. *Cf.* ECF 33-3 at 60 (*e.g.*, Mr. Patton saying, "I didn't deserve to lose my job"). The court therefore finds that a

genuine dispute of material fact exists over whether Forest River took a materially adverse action in involuntarily terminating Mr. Patton.

A genuine question of material fact also remains on whether Mr. Patton was effectively demoted following his claim of harassment. Forest River transferred Mr. Patton from the Sunseeker Plant to the Berkshire Plant about two or three weeks following his initial claim of harassment to Forest River's management and eleven days following his complaints to Forest River's corporate compliance officer and human resource manager, where he alleges that he was given a timecard that did not work, was paid less, and was given different job duties than what he originally expected.

The first challenge he encountered—the timecard—was not so severe as to render his transfer materially adverse. He says his timecard did not initially work at the Berkshire Plant, ECF 30-4 at 282, but this issue was minor and promptly fixed. Trivial administrative errors that get resolved and do not cause an employee lasting harm aren't of the nature to dissuade a reasonable employee from engaging in protected activity. *See Lewis*, 909 F.3d at 867-68 (failure to provide federal employee a locker and delay of employee's paycheck were not materially adverse actions). Mr. Patton has not adduced any evidence that would indicate that Forest River intended to give him a malfunctioning timecard or otherwise retaliated in delaying delivery of that card or correction of the issue. No one disputed at oral argument that this timecard issue had no impact on his pay.

The court is more concerned with the evidence of Mr. Patton's decrease in pay and Forest River's failure to follow its protocol and promises about the transfer. Mr. Patton complains he made less at the new plant. Lateral transfers in which an employee's pay is diminished can constitute a materially adverse action. *See O'Neal*, 392 F.3d at 911; *Williams*, 85 F.3d at 274 ("A cut in base pay not offset by an increase in some other form of compensation would be a demotion, and hence a materially adverse employment action."). Mr. Patton shows that he made a weekly average of $1,325 while employed at the Sunseeker Plant but made $1,200 per week while at the Berkshire Plant (omitting his

last partial work week).[4] Mr. Patton says he made an average of $24 per hour at Berkshire while he made an average of $35 at Sunseeker during the eight weeks he worked before his transfer, despite the human resource manager's representation to Mr. Patton that he would retain his current rate of pay after the transfer.

Looking at raw numbers, particularly his gross pay, Mr. Patton lost about $125 per week in pay on average in comparison to his last thirteen working (non-holiday) weeks at Sunseeker. The court declines Forest River's invitation to view this as less than material as an adverse action, as Mr. Patton communicated to Ms. Tubicsak that he had a family to support and accumulated bills when discussing the circumstances under which he would agree to a transfer. ECF 30-2 at 59; ECF 41-1 ¶ 9. A sensible jury could view that loss in pay as one "materially adverse to a reasonable employee." *Burlington*, 548 U.S. at 57.

In addition, based on the only financial information before the court, that lower pay came at the cost of having to work more hours: an average of 59 hours per week at Berkshire (averaging the last three full weeks) compared to just over 39 hours at Sunseeker (averaging the last thirteen full, non-holiday weeks)—a 51 percent increase in labor for less pay. ECF 35-8, 35-11, Exs. G, J. Forest River was smart at oral argument to suggest a comparison of apples to apples, but it provided no argument or evidence to facilitate that comparison or to show how Mr. Patton was compensated at Berkshire (whether at piece rate like at Sunseeker or by way of a different method), how the pay differential at more hours was equal or comparable (particularly after Mr. Patton complained about that to the human resource manager, ECF 41-1 ¶ 13), or even why that lower pay for more hours had been properly instituted (after the HR manager said it would not be) to fend off an inference of retaliation.

What is clear on this record, taking the facts in the light most favorable to Mr. Patton, as the court must, is that Wendy Tubicsak, Forest River's human resource manager, told him that his

---

[4] The court has adjusted these figures from those offered in Mr. Patton's briefing.

compensation would not change if he transferred to another plant. ECF 41-1 ¶ 9. Mr. Patton says he agreed to a transfer only if his pay would remain the same. *Id.* Before the transfer, Ms. Tubicsak and Mr. Patton discussed the idea; and, according to a transcript of their conversation (albeit undated but from its context before the transfer occurred), Mr. Patton agreed to a transfer if his "wages [were] roughly the same." ECF 30-1, Ex. 3. The HR manager responded, "Oh absolutely. Absolutely. . . . I wouldn't put you somewhere that was going to hinder your income." *Id.* Mr. Patton expressed his concern about the "good money" he was making at Sunseeker and that he had accumulated some bills to pay, and the HR manager again assured him that she was "looking at other divisions that will pay you a decent wage like you were making here [at Sunseeker]. It has to be, it has to be comparable." *Id.* On this record, a reasonable jury could conclude that his lower pay at more hours was not just contrary to the HR manager's promise, but materially adverse.

The court has also considered Mr. Patton's change in job duties, where he claims that the Berkshire Plant failed to provide adequate opportunities for him to exercise his skills. A lateral transfer that involves a "dramatic downward shift in skill level" can be a materially adverse action. *See Latham v. Donahue*, 40 F. Supp. 3d 1023, 1028 (N.D. Ill. 2014) (citing *Williams*, 85 F.3d at 274). Almost any job transfer, by definition, will result in some changes to the employee's work responsibilities, so a plaintiff must show something more than the ordinary difficulties associated with a job transfer. *O'Neal*, 392 F.3d at 913. When a plaintiff voluntarily agrees to reduced work responsibilities as a result of a voluntary transfer, the court views any claim of material adverse impact with suspicion. *See Sercer v. Holder*, 104 F. Supp. 3d 746, 751 (E.D. Va. 2015).

At Sunseeker, Mr. Patton had worked in the electrical department. ECF 41-1 ¶ 3. At the Berkshire plant, he was assigned eventually to final finish work, which involved physically light, low-skilled work, according to him a step below what he previously did at Sunseeker. *Id.* ¶¶ 11, 13. Mr. Patton claims that this demotion in labor happened even though Ms. Tubicsak stated her expectations

to Mr. Patton that he be transferred into the electrical department at Berkshire because that was "protocol" and "standard operating procedure" whenever a lateral transfer occurred. ECF 41-15 at 33-35. In addition to his claim that the work was a demotion for him, Mr. Patton also says the work was more difficult. For example, he states that he cleaned motor homes with a cleaner that emitted an acrid odor and burned his nose and throat in a poorly ventilated space, noting he was forbidden from opening the doors. ECF 41-1 ¶ 11. He was also required to swap several 150-pound chairs but was not allowed to use any moving equipment to do so. *Id.*

What is less clear on this record is what the expectation was for Mr. Patton's new job duties at the Berkshire Plant. The HR manager testified that Forest River's "protocol" and her expectation was that Mr. Patton would be transferred into the same department at Berkshire where he worked at Sunseeker (electrical department). ECF 41-15 at 33-35. She testified, "that's what they were supposed to do." *Id.* at 34. Mr. Patton's counsel conceded at oral argument, however, that Mr. Patton seemed to know before the transfer that he would not immediately be placed in the electrical department at Berkshire, though that was the expectation eventually. That seems consistent with a taped conversation that the Berkshire plant manager (Scott Chambers) had with Mr. Patton, though again it remains unclear when this conversation took place on this record. ECF 30-1, Ex. 2 at 1. *See also Mattingly v. University of S. Fla. Bd. of Trustees*, 931 F. Supp. 2d 1176, 1188-89 (M.D. Fla. 2013) (employee who voluntarily chose to move to a position with different work did not suffer a material adverse action when there was no evidence that he "was forced into [the] decision").

In a vacuum, his new duties alone over less than a month, such as cleaning motor homes in the heat (because the company didn't want dust in the units), using acrid cleaners, or moving heavy seats without a hand truck, were more in the vein of inconvenient momentary alterations of his job responsibilities than actionable adverse actions. *See Stephens*, 569 F.3d at 790 ("significant or substantial change to an employee's responsibilities may be materially adverse, but every reassignment is not

automatically actionable"); *see also Burlington*, 548 U.S. at 70 ("Almost every job category involves some responsibilities and duties that are less desirable than others."). To be sure, lateral transfers that contain more harmful consequences can be materially adverse, but not of the ilk here and not given counsel's concession that Mr. Patton had no expectation of being immediately placed in the electrical department. *Cf. Washington v. Ill. Dept. of Rev.*, 420 F.3d 658, 662 (7th Cir. 2005) (finding lateral transfer to be materially adverse where it impacted employee's flex-time schedule that was critical to care for her disabled child); *and Zelaya v. UNICCO Serv. Co.*, 733 F. Supp. 2d 121, 132 (D.D.C. 2010) (employer's lateral transfer of employee was "materially adverse action" under Title VII where employee lost seniority as the result of such transfer); *with Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996) (holding a purely lateral transfer to not be a materially adverse consequence). In addition, Mr. Patton does not seem to argue forcefully that, in the mere three weeks or so that he worked at the Berkshire Plant, that his career prospects had been so diminished or stunted by the work he had done up to that point that the change in job duties was materially adverse. *See O'Neal*, 392 F.3d at 911. Once a jury hears that Mr. Patton endured these jobs for more hours and less pay, however, it would be reasonable for that jury to see the transfer as a demotion and materially adverse.

A transfer taken voluntarily is not an adverse employment action. *See Simpson v. Borg-Warner Auto., Inc.*, 196 F.3d 873, 876 (7th Cir. 1999) (employee who voluntarily requested demotion while subsequently turning down a transfer to a different supervisory position was not an adverse employment action). Mr. Patton agreed to be transferred—but not demoted. A triable issue remains whether a demotion in the form of this transfer was materially adverse given Forest River's protocol and differing promises. Here, reasonable minds could differ over whether Mr. Patton's transfer was voluntary or involuntary. That question is for the jury.

3.      *A Reasonable Jury Could Find that Mr. Patton's Complaint of Sexual Harassment Caused His Demotion and Termination.*

The court now turns to the third prong of this retaliation claim—causation. Mr. Patton must prove that any materially adverse action was causally related to his statutorily protected activity. He must show that but for the protected act, he would not have suffered the adverse employment action. *Cung Hnin v. TOA (USA), LLC*, 751 F.3d 499, 508 (7th Cir. 2014) ("Retaliation claims under Title VII require traditional but-for causation, not a lesser 'motivating factor' standard of causation.") (quoting *Reynolds v. Tangherlini*, 737 F.3d 1093, 1104 (7th Cir. 2013)). Here, the court must assess whether the FMLA leave or claim of harassment were but-for causes of his demotion or termination.

The court rejects Mr. Patton's invitation to assess the record as a "convincing mosaic" or one that might get bogged down in an outmoded and unhelpful distinction between "direct" and "indirect" evidence. *See Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016) (citing *Ortiz*, 834 F.3d at 765). This circuit favors a straightforward inquiry: "Does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the [adverse action]?" *Id.*

The court can dispose of any tie to Mr. Patton's FMLA leave. On this record, no reasonable jury could find that, but for his leave, his demotion or termination would not have occurred. The decision to transfer Mr. Patton was made before his FMLA leave, and the court cannot find any evidence in this record that would connect his eventual termination to his FMLA leave. Although the termination occurred less than a month after Mr. Patton returned from FMLA leave, mere temporal proximity alone is not enough to establish causation. *See Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 981 (7th Cir. 2004) ("clear that mere temporal proximity is not enough to establish a genuine issue of material fact"). The court presented this view at oral argument, *see* Tr. at 3, but Mr. Patton offered no argument to the contrary.

With his FMLA leave eliminated as causative, Mr. Patton's retaliation claim hinges on his argument that his complaint of harassment caused either the demotion or termination, or both.

Regarding the demotion, the court cannot say that his complaints of harassment did not cause the demotion as a matter of law. Forest River argued in briefing that Mr. Patton acknowledged his transfer was not retaliatory, *see* ECF 30 at 7, 14, 16, and 19 (citing ECF 30-2 at 10, 59, 93, 174, and 177[5]), but the company conceded at oral argument that his testimony was ambiguous on this point and not so certain, and rightfully so, *see* Tr. at 39-44. Indeed, a reasonable jury could view his testimony as contra Forest River's claim in this regard.

Following Mr. Patton's harassment claim, his supervisors at Sunseeker made comments that a reasonable jury could conclude were directed toward his claim. This included Ron Daly's statement that Mr. Patton "lost [his] kitty" and Tim Buell's comments that there was "not a hair on [Mr. Patton's] ass." ECF 30-2 at 63, 94. Though these statements alone are not enough to constitute materially adverse actions, *see Burlington*, 548 U.S. at 68, they could lead a reasonable jury to infer Forest River's retaliatory intent post-complaint. *See also Payne*, 337 F.3d at 770 (court must avoid "the temptation to decide which party's version of the facts is more likely true"). The fact remains that transfer was never a subject of discussion until Mr. Patton complained of harassment—indeed two sets of complaints; and, rather than ensure a correction of behavior by its supervisors on this record, the company chose instead to move Mr. Patton from a position that suitably paid him to a lesser one. He would seemingly agree until he soon realized that the company had actually demoted him. His protected complaints thus caused his demotion on this record—so a reasonable jury could conclude. This was acknowledged by Forest River in argument (Tr. 26-27). Forest River offers no explanation for the demotion, much less a legitimate one.

The court now addresses Mr. Patton's termination. Forest River terminated him because he had poor work attendance, though it acknowledged that his performance did not *per se* violate any specific provision of its employee attendance policy. *See* Tr. 8-9. Forest River's basis for termination

---

[5] This latter page does not appear in the record.

is reflected in an October 19, 2017 email from its Berkshire plant manager (Scott Chambers) to its human resource manager (Wendy Tubicsak):

> I am washing my hands of this guy . . . September 30th called in sick . . . October 16th called in sick . . . October 17th left without telling anyone (said had Dr. appointment) . . . October 18th had to leave (said his alarm was going off at his house) . . . October 19th no call/No show.

ECF 41-23. The same rationale was recorded in the company's October 20, 2017 personnel action notice that terminated Mr. Patton. ECF 41-4. Forest River offers no other basis for termination.

Mr. Patton contests this rationale for firing him. He agrees he reported being sick on October 16. He says he informed his supervisor (Jason Smith) that he was leaving for medical treatment on October 17—contrary to the allegation that he left without telling anyone. ECF 41-1 ¶ 15. Given that he was out sick the previous day with what he thought might be strep throat, such a doctor's appointment makes sense. *Id.* He likewise disputes the facts for October 18, when he says he reported to work, but management sent everyone home because of a power outage. *Id.* He does not remember what happened on October 19 but says that it "was always [his] practice to notify management anytime [he] was unable to work." *Id.* Mr. Patton adds that the company always excused his absence from work due to illness during the five years he worked there, until he complained about harassment. *Id.*

The court must resist the urge to resolve these factual issues. If the jury credits Mr. Patton's testimony that his only unexcused absence was on October 19, then the company's stated basis for his termination was razor thin—particularly for an employee who had never received a warning or write up or been disciplined for anything in more than five years of employment. *Id.* ¶ 5. The court recognizes that the Berkshire plant manger's role in the termination seems at first blush attenuated from the complaints at Sunseeker, but the human resource manager and Berkshire plant manager had discussed the transfer, so it is a fair inference that the plant manager was aware of the circumstances that led to the transfer. Undoubtedly there is more to the story here, but this record provides no rationale why his boss felt constrained to "wash his hands" of Mr. Patton based on one unexcused

absence. The record is not aided by any exit interview or other documentation. Indeed, it is confounded by the company's shifting position on whether Mr. Patton was involuntarily or voluntarily terminated (presumably because of the company's policy that three unexcused absences would be deemed abandonment of employment that the company later determined was unsupportable). And oddly, Mr. Patton learned of his termination from a line foreman who was not his supervisor and who told him to clock out and wait in the break room until management arrived. Mr. Patton's inquiry to the human resource manager the day of his termination went unanswered. *Id.* ¶ 14.

Outside of the factual disputes that surround his termination, additional color comes from his Berkshire supervisor, Jason Smith, who once said after Mr. Patton had been moved to his department, "I've been told not to get too used to you being here!" ECF 41-1 ¶ 12. While it is unclear on this record what Mr. Smith meant by this statement, a reasonable jury could conclude that his statement evinced Forest River's intent to terminate Mr. Patton even before its stated rationale materialized. Without more context, a reasonable jury could interpret the statement as lurking retaliation. Forest River advocated at oral argument that this comment was too limp to build a bridge of causation between Mr. Patton's complaints and his termination (Tr. 32-33). The court appreciates that point, but interpretation of this particular statement is a question for the jury in light of the surrounding factual disputes. *See Shager v. Upjohn Co.,* 913 F.2d 398, 402 (7th Cir. 1990) ("the task of disambiguating ambiguous utterances is for trial, not for summary judgment").

A reasonable jury would be entitled to consider these factual issues within the context of the timing for both Mr. Patton's demotion and termination. After dealing with the harassment on his own, he complained to his group leader, only to face more comments, so he took his concerns up the ladder to Forest River's corporate compliance officer and later its human resource manager. On this record, and taking all reasonable inferences in Mr. Patton's favor, from that last report on September 11, 2017, he received a demotion within eleven days (September 22) in contradiction of the company's promises,

heard about two weeks later that his supervisor was told not to expect Mr. Patton there long (approximately October 6), and then was terminated in short order (October 20), following disputed sick days that in the past had been excused. This was a precipitous downward spiral for an employee who had faced no discipline from the company in the past, and reasonably leaves retaliation as a legitimate explanation. *See Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 793 (7th Cir. 2007) (adverse action occurring approximately one month after plaintiff complained was deemed suspicious); *see also Suarez v. Kwoks Int'l Trading, Inc.*, 2007 U.S. Dist. LEXIS 71304, 39 (N.D. Ill. Sept. 25, 2007) ("if an adverse action occurs just one month after complaints about discrimination, a jury can infer intent to retaliate"); *cf. Kidwell v. Eisenhauer*, 679 F.3d 957, 966-67 (7th Cir. 2012) (holding five week lapse too long to base a retaliation claim *solely* on suspicious timing because "[f]or an inference of causation to be drawn solely on the basis of a suspicious-timing argument, we typically allow no more than a few days to elapse between the protected activity and the adverse action"); *Filipovic v. K&R Express Sys.*, 176 F.3d 390, 398-99 (7th Cir. 1999) (four months between protected activity and termination was "counter-evidence of any causal connection").

The fulcrum for causation is thus not just the supervisor's ambiguous statement, but several factual issues that remain for the jury. In the same vein, a reasonable jury could discredit the account of Mr. Patton's attendance record and basis for his termination; and, with the other evidence in this record, consider that rationale as pretext for his termination. "Often, the same evidence used to establish the *prima facie* case is sufficient to allow a jury to determine that a defendant's stated reason for terminating a plaintiff was a mere front for an ulterior, unlawful motive." *Valentino v. Vill. of S. Chi. Heights*, 575 F.3d 664, 673 (7th Cir. 2009). Accordingly, the retaliation claim must be allowed to proceed.

CONCLUSION

Mr. Patton has established genuine issues of material fact on his retaliation claim. Mr. Patton engaged in two protected activities: taking FMLA leave and making good faith complaints of sexual harassment. Forest River took two materially adverse actions against him: demoting and terminating him. Although the court finds as a matter of law that the FMLA leave did not cause either the demotion or termination, a triable issue on causation is presented by way of his claims of sexual harassment. Accordingly, the court DENIES Forest River's motion for summary judgment, except as to any retaliation claim related to the FMLA leave (ECF 29). The court DENIES Mr. Patton's motion to strike (ECF 32).

SO ORDERED.

February 18, 2020                                  *s/ Damon R. Leichty*
                                                   Judge, United States District Court